**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 03-WY-1712 CB(OES)

HIGH COUNTRY CITIZENS' ALLIANCE,
THE WILDERNESS SOCIETY,
TROUT UNLIMITED,
WESTERN COLORADO CONGRESS,
WESTERN SLOPE ENVIRONMENTAL RESOURCE COUNCIL,
ENVIRONMENTAL DEFENSE, and
NATIONAL PARKS CONSERVATION ASSOCIATION,

      Plaintiffs,

v.

GALE NORTON, Secretary of the Department of the Interior,
UNITED STATES DEPARTMENT OF THE INTERIOR,
FRAN MINELLA, Director of the National Park Service, and
NATIONAL PARK SERVICE,

      Defendants,

v.

COLORADO FARM BUREAU,
COLORADO STATE ENGINEER,
COLORADO DIVISION ENGINEER FOR WATER DIVISION 4,
COLORADO WATER CONSERVATION BOARD,
COLORADO DIVISION OF WILDLIFE, and
COLORADO RIVER ENERGY DISTRIBUTORS ASSOCIATION,

      Intervenor Defendants.

---

**ORDER GRANTING MOTION TO SET ASIDE AGENCY ACTION AND**
**DENYING FEDERAL DEFENDANTS' MOTION TO DISMISS**

This matter is before the Court on two motions.  The Plaintiffs have filed a motion to set aside agency actions of the United States Department of the Interior and the National Park Service. Gale Norton, Secretary of the Department of the Interior, the United States Department of the Interior, Fran Minella, Director of the National Park Service, and the National Park Service (the federal Defendants) have filed a motion to dismiss this action for lack of justiciability, or in the alternative, uphold the challenged agency actions.[1] The intervenor Defendants filed an opening brief urging the Court to deny Plaintiffs' motion to set aside the agency actions.  Upon reviewing the file and administrative record,  reading the briefs of the parties, hearing oral argument, and being fully advised, the Court **FINDS** and **ORDERS** as follows:

## BACKGROUND

**The Gunnison River**

The Black Canyon of the Gunnison National Park (the Black Canyon or the canyon) is located in west-central Colorado in the center of the Gunnison River Basin.  (A.R. 8331.)  This action involves the right to water from the Gunnison River for the preservation of the canyon.  A brief overview of the river's history is helpful to understanding the issues presented for the Court's determination.

---

[1]A statement of the parties and jurisdiction is set forth in this Court's April 20, 2004 Order Denying Defendants' Motion to Dismiss.

Competition for the water of the Gunnison River has often been as turbulent as the river itself. Since the initial development of the river basin in early 1900, the river water has been a highly sought commodity. Early expeditions through the Black Canyon seeking irrigation water for the nearby arid Uncompahgre Valley led to the development of the Uncompahgre Valley Reclamation Project and construction of the Gunnison Tunnel from 1901-1910. (Id. at 8334.) The tunnel diverts water upstream from the canyon under the provisions of a 1902 decree, which is one of the most senior rights in the Gunnison Basin. (Id.)

In 1933, acting pursuant to the Antiquities Act of 1906, 16 U.S.C. § 431, President Herbert Hoover designated the Black Canyon of the Gunnison as a national monument "for the preservation of the spectacular gorges and additional features of scenic, scientific, and educational interest." (A.R. 5792.) As explained in more detail below, under the Winters doctrine, when the federal government reserved the Black Canyon as a national monument, it also reserved water from the Gunnison River necessary for the preservation of the monument.

After the Black Canyon was set aside as a national monument, the Taylor Park Reservoir was constructed. The reservoir was completed by 1937 to store water from the Taylor River, a headwater tributary of the Gunnison River. (A.R. 8334.)

The final major development within the Gunnison River Basin was the construction of the Aspinall Reservoirs by the United States Bureau of Reclamation. The reservoirs were authorized by Congress in the Colorado River Storage Project Act of 1956. The act authorized the Secretary

3

of the Interior to construct four storage projects, including the Aspinall Unit on the Gunnison River above the Black Canyon:

> In order to initiate the comprehensive development of the water resources of the Upper Colorado River Basin, for the purposes, among others, of regulating the flow of the Colorado River, storing water for beneficial consumptive use, making it possible for the States of the Upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments made to and among them in the Colorado River Compact and the Upper Colorado River Basin Compact, respectively, providing for the reclamation of arid and semiarid land, for the control of floods, and for the generation of hydroelectric power, as an incident of the foregoing purposes, the Secretary of the Interior is authorized (1) to construct, operate, and maintain the following initial units of the Colorado River storage project, consisting of dams, reservoirs, powerplants, transmission facilities and appurtenant works: Wayne N. Aspinall, Flaming Gorge, Navajo (dam and reservoir only), and Glen Canyon: Provided, That the Wayne N. Aspinall Dam shall be constructed to a height which will impound not less than nine hundred and forty thousand acre-feet of water or will create a reservoir of such greater capacity as can be obtained by a high waterline located at seven thousand five hundred and twenty feet above mean sea level....

43 U.S.C. § 620. The Aspinall Unit is comprised of a series of three dams which begin about a half-mile upstream from the Black Canyon, the Blue Mesa Dam and Reservoir, the Morrow Point Dam and Reservoir, and Crystal Dam and Reservoir. (A.R. 8334, 12786.) The Aspinall Reservoirs have significantly altered the natural flow regime of the Gunnison River upstream from the Black Canyon by diverting and regulating flows. (A.R. 8326.)

**The Black Canyon of the Gunnison National Park**

A 1954 report from the Assistant Secretary of the Interior to Congress on the Colorado River Storage Project described the formation of the Black Canyon:

It is the historic flows which, over hundreds of millions of years, have carved the spectacular gorge down through the basic, precambrian geological formation to depths ranging from 1,730 feet to as much as 2,425 feet, creating a great earth gash which is, in places, deeper than the width from rim to rim. Other natural weathering forces have combined with the river to create this natural wonder. Spalls, chips, and gravels falling unhindered to the canyon bottom are annually swept away by the great spring tidal flashes of the river.

(A.R. 5693.) In 1999, taking into account the Black Canyon's ecological, geological, scenic, historical and wildlife features, Congress passed the Black Canyon Act which upgraded the Black Canyon national monument to a national park. 16 U.S.C. §§ 410fff, 410fff-2. In upgrading the monument to a national park, Congress provided that **nothing in the Black Canyon Act affected any water right in existence** and that any new water right that the Secretary of the Interior determined necessary for the purposes of the act would be established in accordance with the procedural and substantive requirements of the laws of Colorado. 16 U.S.C. § 410fff-8(b)

Under the Winters doctrine, when the federal government withdraws its land from the public domain and reserves it for a federal purpose, the government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Cappaert v. United States, 426 U.S. 128, 138 (1976) (citing Winters v. United States, 207 U.S. 564 (1908)). The right is a "present perfected right" and is entitled to priority. Arizona v. California, 460 U.S. 605, 610 (1983). The implied reservation of water rights doctrine reserves only that amount of water necessary to fulfill

the purpose of the reservation, no more. Cappaert, 426 U.S. at 141.  As explained in United States v. New Mexico, 438 U.S. 696, 702 (1978):

> Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.

In 1952, Congress enacted the McCarran Amendment which permitted the determination of federal water rights by state courts.  43 U.S.C. § 666; United States v. City and County of Denver, 656 P.2d 1, 9 (Colo. 1982).  The McCarran Amendment eventually led to claims by the United States in the Colorado District Courts in and for Water Divisions 4, 5, and 6 (Colorado water court) for reserved water rights covering national forests and monuments, including the Black Canyon of the Gunnison National Monument.  United States v. City and County of Denver, 656 P.2d at 12.  On March 6, 1978, after several years of proceedings, the water court issued an interlocutory decree awarding the United States an absolute and conditional water right for the Black Canyon (the "water court decree").  Id. at 12-13; In re: The Application for Water Rights of United States, 101 P.3d 1072, 1075 (Colo. 2004) (Mullarkey, J.); (A.R. 13396-98.)  The water court decree granted the United States a "conditional and absolute" right to a quantity of water necessary to conserve and maintain in an unimpaired condition the scenic, aesthetic, natural, and historic objects of the monument, as well as the wildlife in the monument, in order that the monument might provide a source of recreation and enjoyment for all generations.  (A.R. 5777; see also A.R. 5870.)  This

purpose includes the utilization of water in the form of direct flow, storage rights, transportation rights, and well rights for the development, conservation, and management of resident and migratory wildlife; forest improvement and protections; wilderness preservation uses; uses for fish culture, conservation, habitat protection and management, including but not limited to, minimum stream flows as are necessary to insure the continued nutrition, growth, conservation, and reproduction of those species of fish which inhabited such waters on the applicable reservation dates, or those species of fish which are later introduced. (Id.) The decree recognized the United States' priority dates of 1933, 1938 and 1939. (A.R. 5782.); In re: The Application for Water Rights of United States, 101 P.3d at 1075.

The water court decree directed the United States to file with the court a final and specific quantification of the amount of water necessary to fulfill the purposes for which the land was reserved. (A.R. 5782.) The decree provided that, "Such quantification shall take the form of an application to make a conditional water right absolute and shall be subject to the notice and hearing requirements of Colorado law." (Id. at 5783.) Twenty-three years later, in January, 2001, the United States filed an application to quantify the water right of the Black Canyon (2001 quantification application). (A.R. 11081-85.); see also In re: The Application for Water Rights of United States, 101 P.3d at 1076. In the 2001 quantification application, the United States claimed a year-round base instream flow of 300 cubic feet per second (cfs) and higher peak and shoulder flows tied to the expected natural spring run-off each year. (Id.) The priority date of the right claimed was March 2, 1933. (A.R. 11082.)

The federal Defendants note that one of the difficulties faced by the government in developing the 2001 quantification application was reconciling the congressional purpose of the Black Canyon with other federal agencies' mandates requiring the use of the water of the Gunnison River. (Federal Defs.' Opening Mem. 24.) According to the federal Defendants, those agencies include the Bureau of Reclamation which operates the Aspinall Unit, the Department of Energy's Western Area Power Administration which markets the hydroelectric power produced at the Aspinall Unit, the Bureau of Land Management which manages the Gunnison Gorge National Recreation Area immediately below the Black Canyon, and the Fish and Wildlife Service which has responsibility over endangered fish downstream from the Black Canyon in the Colorado River. (Id.) To address the concerns of these agencies, a remark was added to the 2001 quantification application that the Secretary of the Interior would confer with the agencies and other affected interests in implementing the claim. (Id.; A.R. 11084; A.R. 13634.) The remark stated:

> Specific numerical flow limits on peak flows have not been incorporated into this application. The United States recognizes that exercising the right to peak flows described in this claim will require careful consideration of numerous factors, including the structural capacity of upstream dams and potential downstream flooding, among other river management issues. Therefore, the Secretary of the Interior will confer with the State of Colorado, the National Park Service, the Bureau of Reclamation, the Western Areas [sic] Power Administration, the Fish and Wildlife Service and other affected interests in order to ensure that operational decisions to exercise this right are in accord with the best available information and with full consideration of the river management issues noted above.

(A.R. 11084.)

More than 380 parties filed statements in opposition to the 2001 quantification application. In re: The Application for Water Rights of United States, 101 P.3d at 1076. The Colorado water court granted two stays so that the United States could enter into settlement discussions with some of the parties opposing the application. Id. It is not clear who participated in the negotiations concerning settlement. Id.

On April 2, 2003, the United States Department of the Interior and the Colorado Water Conservation Board (CWCB), a division of the Colorado Department of Natural Resources, entered into an agreement as to the amount of water the National Park Service would be entitled to receive for the Black Canyon (the April agreement). (A.R. 6401.) The parties agreed that the National Park Service would relinquish its reserved right to peak and shoulder flows and claim a year-round base flow of the lesser of 300 cfs or natural flow. (Id.) This base flow would have a 1933 priority date. The parties also agreed that the CWCB would seek to appropriate additional instream flow water under Colorado law with a 2003 priority date.[2] This appropriation would be conditioned as follows:

---

[2]An instream flow right is an in-place right to the use of water. A typical instream flow designates a specified level of flow over a stream segment stretching up to several miles. Colorado Water Conservation Bd. v. City of Central, 125 P.3d 424, 437 (Colo. 2005). The Colorado Supreme Court explained in Colorado Water Conservation Bd. v. City of Central that instream flow rights are no different in concept from other appropriative rights. They must be decreed to be administered; are given a fixed priority date, a specified flow rate or volumetric quantity, time and place of use; and are administered like any other water right, but no means of diversion is required. Id. at 438. Implementing instream flows in Colorado, which do not involve diverting water, required modifying the concept of "appropriation" in the existing statutory scheme. In 1973, the Colorado General Assembly identified instream flow legislation as a mechanism to protect the environment. The General Assembly vested the power to appropriate levels of minimum stream flow with the Colorado Water Conservation Board to preserve the natural environment. Instream flow appropriations by the Board obtain a priority date and are

"if Blue Mesa Reservoir is projected to fill and spill by July 31, water **beyond that which satisfies present and future obligations** of the authorized purposes of the Aspinall Unit ... shall be held by the CWCB for decreed instream flow purposes with a 2003 priority date." (Id.) (emphasis added)

The agreement further explained that:

> ii.     The Bureau of Reclamation will deliver the flows of the Gunnison River in accordance with the CWCB instream flow right with the 2003 priority date described in Paragraph 1(b), to the extent that such flows have not been appropriated by senior water rights holders under Colorado law, to the extent that such flows are not subject to appropriation by the Aspinall Unit under the authorized purposes, and to the extent that such flows do not impair the structural integrity of the Aspinall Unit.

> c.     A binding Memorandum of Agreement (MOA) shall be established among the National Park Service, the Bureau of Reclamation and the State of Colorado within 120 days of the date of the last signature on this agreement regarding enforcement and protection of the instream flow right referred to in Paragraph 1(b). The National Park Service shall have authority to enforce and protect the instream flows consistent with state law should the CWCB fail to do so. The implementation of this enforcement authority shall be spelled out in the MOA.

(Id.)

On the same day the United States and the State of Colorado entered into the April agreement, the United States filed a motion to amend its quantification application and a proposed

---

subject to the priority system. Although a validly adjudicated instream flow recognizes a property right vested in the Board on behalf of the people of Colorado, as with all water rights, the value of this property is its priority. Because it is a post-1973 appropriation, the Board's instream flow rights are usually relatively junior in the hierarchy of users. The instream flow cannot take water away from existing uses and the senior will always be able to make its diversion for its decreed beneficial uses. Since the prior appropriation system guarantees that pre-existing uses are unaffected by junior instream flow rights, the date of its priority may be of little value in protecting instream resources. Id. at 438-39.

amended application with the Colorado water court (2003 amended quantification application).

(A.R. 11081-84.); In re: The Application for Water Rights of United States, 101 P.2d at 1076.

On July 31, 2003, the United States and the State of Colorado entered into a Memorandum

of Agreement (July agreement) as contemplated by the April agreement. (A.R. 12666-72.) The July

agreement recited that:

> H.      ... [the April agreement] addresses two water rights benefiting the Black
> Canyon.... The [April agreement] provides that the Park Service will hold a reserved
> water right for 300 cfs or natural flow, whichever is less, with a 1933 priority date,
> and the Board will hold an instream flow water right under Colorado law with a 2003
> priority date, **which will be for water beyond that which satisfies present and
> future obligations of the authorized purposes of Aspinall**, as specified in the
> Colorado River Storage Project Act, 43 U.S.C. § 620 et seq. as in effect on April 2,
> 2003, and under the Aspinall Unit's existing water rights decrees obtained under
> Colorado law.
>
> I.      The [the April agreement] further provides that the National Park Service, the
> Bureau of Reclamation, and the State of Colorado shall enter into a binding
> Memorandum of Agreement regarding enforcement and protection of the Board's
> instream flow water right.  This MOA is the Memorandum of Agreement required
> by the [the April agreement].

(A.R. 6227.) The July agreement expressly provided that the United States could not enforce the

Board's instream flow right in any judicial or administrative proceeding, and that the sole manner

of enforcement would be through an action for specific performance.  (Id. at 6229-30.)

Plaintiffs commenced this action in September, 2003 in response to the April and July

agreements.

## PLAINTIFFS' ARGUMENTS

Plaintiffs' motion to set aside agency action challenges the relinquishment of federal water rights on four bases:

1. The April and July agreements are major federal actions that may significantly affect the environment but were undertaken without the environmental impact analysis mandated by the National Environmental Policy Act (NEPA).

2. The federal Defendants' entry into the April and July agreements unlawfully delegated to the State of Colorado responsibility for the performance of duties that Congress consigned to the federal Defendants.

3. The federal Defendants unlawfully disposed of federal property without Congressional authorization.

4. The federal Defendants' entry into the April and July agreements violated their nondiscretionary duties to protect the Black Canyon's resources.

## ANALYSIS OF ARGUMENTS

**1.      The April and July agreements are major federal actions that may significantly affect the environment but were undertaken without the environmental impact analysis mandated by the National Environmental Policy Act (NEPA).**

Plaintiffs maintain that the federal Defendants violated the core requirements of NEPA by entering into the April and July agreements without an environmental analysis and public participation.  As discussed in this Court's Order Denying Defendants' Motion to Dismiss, NEPA is fundamental administrative law that requires federal agencies to consider the environmental consequences of their proposed actions and to include the public in that process:

NEPA delineates the process by which federal agencies "take a hard look at the environmental consequences" of a proposed agency action.  Before taking "major Federal actions significantly affecting the quality of the human environment,"

12

agencies take that "hard look" at potential environmental impacts by means of an environmental impact statement ("EIS"). See 42 U.S.C. § 4332(2)(C).

Fuel Safe Washington v. Federal Energy Regulatory Commission, 389 F.3d 1313, 1323 (10th Cir.

2004) (internal quotations omitted). The NEPA implementing regulations define "major federal

action" as action with effects which may be major or significant and which are potentially subject

to federal control and responsibility. 40 C.F.R. § 1508.18. Major federal action may include

adoption of formal plans which guide alternative uses of federal resources; adoption of programs,

such as a group of concerted actions to implement a specific policy or plan; or systematic and

connected agency decisions allocating agency resources to implement a specific statutory program

or executive directive. Id.

The Court has carefully analyzed and considered the federal Defendants' and the intervenor

Defendants' thorough history of the Gunnison River and the needs and demands for the river water.

The Gunnison River unquestionably provides a critical water supply for numerous users. The

Defendants clearly describe the competing interests of the state of Colorado and the upper and lower

basin states for this invaluable resource. Defendants contend the competing needs for the river water

justified entering into the April and July agreements, and that the agreements were a creative solution

to meeting multiple needs. In fact, the federal Defendants present their case from a position of

urgency on the part of the Bureau of Reclamation and the present and future users of the Aspinall

unit.

The Court recognizes that the agreements entered into by the federal Defendants and the state

of Colorado bring a sense of relief to a number of users of the river because the agreements eliminate

uncertainty created by competition for a crucial water supply. The critical and competing nature of the interests involved in this case, however, illustrate the magnitude of the action which the Defendants have undertaken in entering into the April and July agreements. As expressed by the Tenth Circuit in Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220 (10th Cir. 2002), concerning the need for an environmental impact statement before designating part of the Rio Grande as critical habitat for silvery minnow:

> The evidence in the record thus demonstrates that the designation will result in a reallocation of water back into the riverbed and could result in a curtailment of river maintenance operations. The effects of these impacts, the loss of irrigated farmland and increased risk of flooding, however, only require preparation of an EIS if they significantly affect the quality of the human environment. See 42 U.S.C. § 4332(2)(C). Human environment should be "interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. Significance is determined by looking at both the context of the action and its intensity. Id. § 1508.27.F "Effects" or impacts include "ecological, ⋯ aesthetic, historic, cultural, economic, social, or health" effects. Id. § 1508.8. Economic and social effects alone, however, do not require preparation of an EIS. Id. § 1508.14.

> The evidence in the record conclusively demonstrates that the effects of water reallocation and curtailment of river maintenance are significant. The reallocation of water to maintain the critical habitat and the accompanying loss of farmland are controversial. See id. § 1508.27(b)(4) (requiring determinations of significance to take into account the degree to which the effects of the action will be "highly controversial"). Controversy in the NEPA context does not necessarily denote public opposition to a proposed action, but a substantial dispute as to the size, nature, or effect of the action. See Wetlands Action Network v. United States Army Corps of Eng'rs, 222 F.3d 1105, 1122 (9th Cir.2000). The wide disparity in the estimates of water required for the designation, and the associated loss of farmland acreage, indicate that a substantial dispute exists as to the effect of the designation. Moreover, the context of the designation is such that its effects will be felt locally in the Middle Rio Grande valley. See 40 C.F.R. § 1508.27(a). Given the aesthetic, economic, ecological, and cultural value of agriculture to the region, even a loss of 2,000 acres of irrigated farmland is significant. Furthermore, the possible failure of flood

protections presents a danger to public health and safety and thus is significant. See id. § 1508.27(b)(2) (requiring determinations of significance to take into account the degree to which the action will affect public safety or health).

Middle Rio Grande Conservancy Dist., 294 F.3d at 1229.

The reasoning of Middle Rio Grande Conservancy Dist. is equally applicable here. The federal Defendants perceive the April and July agreements as a clever compromise which will benefit the significant interests involved. In fact, the federal Defendants suggest that even after public consideration of the 2001 quantification application by the water court, the Black Canyon would have most likely received only the base amount of 300 cfs of water anyway. (Federal Defs.' Opening Mem. 21-22.) In their zeal to reach a resolution to the competing interests, however, the Defendants ignore the right of the public to be involved in such a major and significant decision. Unlike a decision to place a call on a water right in a given year, relinquishing a water right with a 1933 priority date is permanent. Although an annual decision as to how much water to release and whether or not to place a call on senior water rights may be a discretionary matter best left to the National Park Service and the Secretary of the Interior, the same cannot be said for permanently passing up a priority date. A permanent relinquishment of a water right with a 1933 priority date for such a scientifically, ecologically and historically important national park must be viewed as a major action requiring compliance with NEPA.

The record also reveals that the quantity and timing of water allowed to flow through the Black Canyon without a doubt has a significant effect on the human environment. (See, e.g., A.R. 5941-5948.) The federal Defendants assert that the April and July agreements in and of themselves

will have no significant effect on the human environment because the agreements adequately protect

the canyon with base, peak and shoulder flows.  Defendants' assurances, however, do not remove

their actions from the purview of NEPA.  Followed to its logical conclusion, this argument would

allow the government to avoid ever complying with NEPA so long as agency officials believe they

have taken adequate precautionary measures to avoid significant effect on the quality of the human

environment.    Assurances  of  protection,  however,  do  not  remove  the  action  from  NEPA

requirements:

> The short- and long-term effects of the proposed governmental action ... are often
> unknown or, more importantly, initially thought to be beneficial, but after closer
> analysis determined to be environmentally harmful.  Furthermore, that the Secretary
> believes the effects of a particular designation to be beneficial is equally immaterial
> to his responsibility to comply with NEPA.  "[E]ven if the Federal agency believes
> that on balance the effect [of the action] will be beneficial," regulations promulgated
> by the Council on Environmental Quality (CEQ) nonetheless require an impact
> statement.  40 C.F.R. § 1508.27(b)(1); see also Environmental Defense Fund v.
> Marsh, 651 F.2d 983, 993 (5th Cir.1981).  NEPA's requirements are not solely
> designed to inform the Secretary of the environmental consequences of his action.
> NEPA documentation notifies the public and relevant government officials of the
> proposed action and its environmental consequences and informs the public that the
> acting agency has considered those consequences.  A federal agency could not know
> the potential alternatives to a proposed federal action until it complies with NEPA
> and prepares at least an EA.

> To interpret NEPA as merely requiring an assessment of detrimental impacts upon
> the environment would significantly diminish the act's fundamental purpose-to "help
> public officials make decisions that are based on understanding of environmental
> consequences, and take actions that protect, restore, and enhance the environment."
> 40 C.F.R. 1500.1(c).  Appellants' theory would cast the judiciary as final arbiter of
> what federal actions protect or enhance the environment, a role for which the courts
> are not suited.

Catron County Bd. of Com'rs, New Mexico v. United States Fish & Wildlife Service, 75 F.3d 1429,

1437-38 (10th Cir. 1996).

The federal Defendants' belief that they have insulated the Black Canyon from harm in

relinquishing a 1933 priority to shoulder and peak flows by entering into the April and July

agreements does not remove their actions from NEPA.  As this Court stated in its 2004 Order

Denying Defendants' Motion to Dismiss, in a drought year in an arid climate, every bucket of water

counts.  A decision to enter into agreements which permanently give up a priority to a resource

which must be "saved for all generations" must be made in public view and not behind closed doors

with the public's interest in mind.[3]

**2.      The federal Defendants' entry into the April and July agreements unlawfully delegated to the State of Colorado responsibility for the performance of duties that Congress consigned to the federal Defendants.**

The National Park Service Organic Act of 1916 created the National Park Service to promote

and regulate the use of national parks so as to "conserve the scenery and the natural and historic

objects and the wild life therein and to provide for the enjoyment of the same in such manner and

by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C.

§ 1.  The National Park Service was consequently charged with the administration of the Black

Canyon of the Gunnison National Park.  16 U.S.C. § 410fff-2(b).  The Black Canyon of the

_____

[3]This Court is not convinced that by labeling the decision to enter the April and July
agreements as a litigation decision, the Defendants can avoid complying with NEPA.  As also
explained in this Court's April 20, 2004 Order Denying Defendants' Motion to Dismiss,
Defendants cannot shield their conduct from review or from the ambit of NEPA simply because
the federal Defendants have advocated their position in water court.

Gunnison National Park and Gunnison Gorge National Conservation Area Act of 1999 affirmed that the Black Canyon Monument "was established for the preservation of its spectacular gorges and additional features of scenic, scientific, and educational interests." 16 U.S.C. § 410fff(1). A portion of the Black Canyon has also been designated as wilderness. 16 U.S.C. § 410fff-4. Under the Wilderness Act of 1964, this wilderness area must be administered in such a manner as will leave it unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of the area, and the preservation of its wilderness character. 16 U.S.C. §§ 1131(a), 1133(b). It is without a doubt that the Black Canyon of the Gunnison is a pre-eminent treasure of the people of Colorado, as well as the people of the United States. The water of the Gunnison is vital to the beauty and enjoyment of this spectacular wilderness area. Relinquishment of any rights, authority or responsibility has to be done cautiously and in compliance with all of the public's laws.

Plaintiffs complain that although the July agreement recognizes that the "National Park Service is the federal agency responsible for protecting the natural resources, including the water resources, of the Black Canyon of the Gunnison National Park," the April agreement delegates a significant portion of this responsibility to the state of Colorado. The responsibility is delegated through reliance on the Colorado Water Conservation Board to produce instream flows above 300 cfs when the Park Service concedes that flows above 300 cfs are necessary to preserve the canyon.

Plaintiffs contend that the delegation of authority and responsibility to the Colorado Water Conservation Board is prohibited. This Court agrees. While federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary

congressional intent, they may not subdelegate to outside entities -- private or sovereign -- absent affirmative evidence of authority to do so. United States Telecom Association v. Federal Communications Association, 359 F.3d 554, 566 (D.C. Cir. 2004), cert. denied, 543 U.S. 925 (2004). The fact that the subdelegation is to state commissions rather than private organizations does not alter the analysis.[4] Delegation to outside entities increases the risk that these parties will not share the agency's "national vision and perspective," and thus may pursue goals inconsistent with those of the agency and the underlying statutory scheme. Id. at 565-66.

The federal Defendants suggest that the April and July agreements did not delegate responsibility for the management of the Black Canyon's water resources because there is uncertainty whether the United States' water right will exceed 300 cfs. Defendants' argument is

---

[4]The cases cited by the intervenor Defendants do not hold otherwise. As explained in United States Telecom Association, 359 F.3d at 567, the cases are inapposite because they do not involve subdelegation of decision-making authority:

[A] federal agency entrusted with broad discretion to permit or forbid certain activities may condition its grant of permission on the decision of another entity, such as a state, local, or tribal government, so long as there is a reasonable connection between the outside entity's decision and the federal agency's determination. Thus in United States v. Matherson, 367 F. Supp. 779, 782-83 (E.D. N.Y. 1973), aff'd 493 F.2d 1339 (2d Cir. 1974), the court upheld the decision of the Fire Island National Seashore Superintendent to condition issuance of federal seashore motor vehicle permits on the applicant's acquisition of an analogous permit from an adjacent town. And Southern Pacific[Transp. Co. v. Watt, 700 F.2d 550, 556 (9th Cir. 1983)], citing Matherson, sustained the Secretary of Interior's conditioning of right-of-way permits across tribal lands on the tribal government's approval. In contrast to these cases, where an agency with broad permitting authority had adopted an obviously relevant local concern as an element of its decision process, the Commission here has delegated to another actor almost the entire determination of whether a specific statutory requirement-impairment-has been satisfied.

unpersuasive. The federal Defendants freely admit that the Black Canyon needs shoulder and peak flows. The April and July agreements in and of themselves evidence that the canyon needs periodic flows exceeding 300 cfs. The 1978 water decree specifically provided that the canyon was entitled to a quantity of water necessary to conserve and maintain in an unimpaired condition the scenic, aesthetic, natural, and historic objects of the monument, as well as the wildlife in the monument, in order that the monument might provide a source of recreation and enjoyment for all generations of citizens of the United States. (A.R. 5777-79.) This purpose included water necessary for the preservation of the wilderness uses, wildlife and fish. (A.R. 5782.); In re: The Application for Water Rights of United States, 101 P.3d at 1075.

Despite the water court's decree of a quantity sufficient to meet the needs of the Black Canyon, the federal Defendants insist that because the water court has not decreed an exact amount of water it deems necessary to fulfill the needs of the canyon, the United States has somehow not given up a water right which the canyon needs. The reality of the matter, however, is that the federal Defendants reached a compromise which satisfied a number of interests. The Court does not judge the value of the compromise, but does judge the manner in which the compromise was reached. The compromise was reached through delegating the determination and acquisition of the proper peak and shoulder flows to the state of Colorado. The federal Defendants urge that the compromise was innovative considering all of the demands on the Gunnison River. Such a delegation, however, was neither necessary nor permissible. The Colorado water court will be able to determine the exact

amount of water necessary for the Black Canyon, and that water, with its 1933 priority, will preserve the canyon long after this administration and its successors have left office.

**3.      The federal Defendants unlawfully disposed of federal property without Congressional authorization.**

Plaintiffs also challenge the April and July agreements as a partial relinquishment of a federal reserved water right for the Black Canyon without specific authorization from Congress. Plaintiffs reason that the federal reserved water right for the Black Canyon is a property interest that cannot be given up without Congressional authorization. The federal and intervenor Defendants respond that the government has retained the entire property right awarded by the Colorado water court, and for this Court to decide otherwise would intrude upon the water court's jurisdiction.

This Court finds, as it did in its Order Denying Defendants' Motion to Dismiss, that a federal reserved water right constitutes property, not just from the time the right is quantified, but from the time the reservation is created. The right arises on the date of the reservation and continues to exist even if it has not been asserted:

> [W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.

Cappaert v. United States, 426 U.S. at 138.

21

The right to a volume of water necessary to serve the canyon's purpose arose when the United States established the Black Canyon of the Gunnison National Monument in 1933. There is consensus that the Black Canyon requires a greater quantity than the federal Defendants proposed in the 2003 amended quantification application. Accordingly, the decision to seek adjudication of a smaller amount than needed represents a disposition of federal property. Only Congress, and not an executive branch agency, can authorize the disposition of federal property. Gibson v. Chouteau, 80 U.S. 92, 99 (1871); United States v. Steinmetz, 763 F. Supp. 1293, 1298 (D. N.J. 1991) ("only Congress and those persons authorized by Congress may dispose of United States property pursuant to appropriate regulations"), aff'd, 973 F.2d 212 (3d Cir. 1992). It is of no consequence that the exact quantity of water the water court will award is unknown because it is evident that the federal Defendants contracted to give up what Congress specifically authorized: a 1933 reserved water right to the quantity of water needed by the canyon.

**4.      The federal Defendants' entry into the April and July agreements violated their nondiscretionary duties to protect the Black Canyon's resources.**

Plaintiffs allege that the April and July agreements and the relinquishment of a reserved water right in return for a an instream flow right held by the Colorado Water Conservation Board violate the duty to protect park resources imposed on the Park Service by the National Park Service Organic Act, the Black Canyon Act, and the Wilderness Act. Plaintiffs assert that the federal Defendants' actions were consequently arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).

22

The federal and intervenor Defendants first respond that the April and July agreements are not reviewable under the APA. They contend that the agreements are not reviewable under the APA because they are not "discreet agency actions." The Defendants assert that the agreements merely address the subject of current litigation -- the quantity of water encompassed in the canyon's federal reserved water right. The Defendants rely on <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55 (2004) (<u>SUWA</u>) to support their stance.

In <u>SUWA</u>, the plaintiffs sued the Bureau of Land Management (BLM) and others for injunctive relief contesting the BLM's failure to protect wilderness study areas in Utah from damage caused by off-road vehicles. The action was instituted to "compel agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1) of the Administrative Procedure Act. <u>Id.</u> at 63. The high court held that an APA claim under 5 U.S.C. § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a <u>discreet agency action</u> that it is <u>required</u> to take. A plaintiff therefore cannot bring a broad programmatic attack on an agency's failure to take action.

This Court agrees with the Plaintiffs that review of the April and July agreements is not precluded by <u>SUWA</u>. The April and July agreements are "agency actions" and the Plaintiffs' challenge to the agreements is not a broad programmatic attack. An agency action includes a statement that announces a rule of law, imposes obligations, determines rights or liabilities, or fixes legal relationships. <u>Industrial Safety Equipment Association v. Environmental Protection Agency</u>, 656 F. Supp. 852, 855 (D.D.C. 1987), <u>aff'd</u>, 837 F.2d 1115 ( D.C. Cir. 1988). The agreements are

agency actions that would result in a permanent limit on the use of the river water for the canyon. This is clearly the type of action for which review under the APA is intended.

The Court further agrees that the Plaintiffs' claims do not pose an attack under § 706(1) on the failure to implement broad agency policy. The Plaintiffs are challenging discrete actions, the April and July agreements, as arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A) because the agreements violate the National Park Service's duty to protect the canyon's resources under the National Park Service Organic Act, the Black Canyon Act and the Wilderness Act. 5 U.S.C. §706 provides, in part:

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....

SUWA allows for such a challenge under § 706(2)(A) to specific agency actions. See Oregon Natural Resources Council Fund v. Brong, 2004 WL 2554575 at *10 (D. Or. Nov. 8, 2004) (finding that SUWA allowed a challenge to site specific final agency actions under § 706(2) of the APA that the BLM failed to conform to the provisions of a resource management plan); Oregon Natural Desert Association v. United States Forest Service, 2004 WL 1592606 at *9 (D. Or. July 15, 2004) (concluding that plaintiffs' dispute of decisions to authorize grazing allegedly inconsistent with forest

plan requirements fell within the kinds of dispute recognized in <u>SUWA</u> as valid and viable as challenges to discrete, final agency actions pursuant to § 706(2) of the APA); <u>Puglia Engineering v. United States Coast Guard</u>, 2005 WL 106785, at *4 (N.D. Cal. Jan. 18, 2005) (holding that <u>SUWA</u> did not preclude the review of the Coast Guard's granting, but then rescinding, the award of a contract where Plaintiff's claims fell under 5 U.S.C. § 706(2)(A), not § 702(1)).

Finally, the federal Defendants also argue that the decision to enter the April and July agreements is not reviewable because decisions on how to protect the canyon's resources are committed to agency discretion. Under 5 U.S.C. § 701(a)(2), review of an agency decision is not available in those rare circumstances where the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. <u>Merida Delgado v. Gonzales</u>, 428 F.3d 916, 920 (10th Cir. 2005). This is not the case here.

As this Court explained in its 2004 Order Denying Defendants' Motion to Dismiss, the National Park Service has a legal obligation to protect the resources of the national parks. The National Park Service Organic Act of 1916 created the Park Service to promote and regulate the use of national parks so as to "conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. The National Park Service is charged with the administration of the Black Canyon of the Gunnison National Park. 16 U.S.C. § 410fff-2(b). The Black Canyon of the Gunnison National Park and Gunnison Gorge

National Conservation Area Act of 1999 provides that the Black Canyon Monument "was established for the preservation of its spectacular gorges and additional features of scenic, scientific, and educational interest." 16 U.S.C. § 410fff(1). A portion of the Black Canyon has also been designated as wilderness. 16 U.S.C. § 410fff-4. Under the Wilderness Act of 1964, this wilderness area must be administered in such a manner as will leave it unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of the area, and the preservation of its wilderness character. 16 U.S.C. §§ 1131(a), 1133(b).

The statutes governing the National Park Service's administration of the Black Canyon provide a meaningful standard against which to judge the agency's exercise of discretion. In fact, in SUWA, the United States Supreme Court recognized that the Wilderness Act imposes a mandatory obligation to manage wilderness study areas so as not to impair their suitability for preservation. SUWA, 542 U.S. at 59. The Tenth Circuit reached a similar conclusion in Sierra Club v. Yeutter, 911 F.2d 1405, 1413 (10th Cir. 1990), when the court articulated that the Wilderness Act imposes an affirmative duty to administer wilderness areas so as to preserve their wilderness character. The National Park Service Organic Act, the Black Canyon Act and the Wilderness Act all impose an affirmative duty on the Park Service to preserve the Black Canyon and provide meaningful standards to apply in assessing whether the Park Service is fulfilling its mandates. This Court is accordingly not precluded from reviewing the decision to enter into the April and July agreements.

Since the Plaintiffs' claims are reviewable, it is appropriate to proceed to the merits of

Plaintiffs' argument that the April and July agreements were an abuse of discretion or otherwise not

in accordance with the law under 5 U.S.C. § 706(2)(A) because the agreements violate the National

Park Service's duty to protect the canyon's resources under the National Park Service Organic Act,

the Black Canyon Act and the Wilderness Act.  The Tenth Circuit thoroughly set forth the standard

for reviewing the agreements in Colorado Wild, Heartwood v. United States Forest Service, 435 F.3d

1204 (10th Cir. 2006):

> The scope of our review under the "arbitrary or capricious" standard is narrow and we are not to substitute our judgment for that of the agency.  We confine our review to ascertaining whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made.  In reviewing the agency's explanation, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment.  Agency action will be set aside if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

> Because the arbitrary and capricious standard focuses on the rationality of an agency's decision making process rather than on the rationality of the actual decision, it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.  Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record.  The agency must make plain its course of inquiry, its analysis and its reasoning.  After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles.

> In addition to requiring a reasoned basis for agency action, the "arbitrary or capricious" standard requires an agency's action to be supported by facts in the record.  Accordingly, agency action will be set aside as arbitrary unless it is supported by substantial evidence in the administrative record.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Id., 435 F.3d at 1213 (citations and internal quotation marks omitted).  In analyzing the Department of the Interior and the National Park Service's informal interpretation of the statutes governing the administration of the Black Canyon, this Court must consider the agency interpretation to the extent that the interpretation is well reasoned and has a power to persuade.  Martinez v. Flowers, 164 F.3d 1257, 1261 (10th Cir. 1998); Fristoe v. Thompson, 144 F.3d 627, 631 (10th Cir. 1998).

The evidence relied on by the federal Defendants and the Plaintiffs, and the April and July agreements themselves, show that the canyon needs periodic peak and shoulder flows.  The federal Defendants, however, insist that the April and July agreements were not arbitrary or capricious because they protect the canyon's needs by relying on the Colorado Water Conservation Board's ability to provide for the canyon under the instream flow program.

As discussed above, the 1978 water decree specifically provided that the canyon was entitled to a quantity of water necessary to conserve and maintain in an unimpaired condition the scenic, aesthetic, natural, and historic objects of the monument, as well as the wildlife in the monument, in order that the monument might provide a source of recreation and enjoyment for all generations of citizens of the United States.  (A.R. 5777-79.)  This purpose includes rights for the development, conservation, and management of resident and migratory wildlife; forest improvement and protections; wilderness preservation uses; uses for fish culture, conservation, habitat protection and

management, including minimum stream flows as are necessary to insure the continued nutrition, growth, conservation, and reproduction of those species of fish which inhabited such waters on the applicable reservation dates, or those species of fish which are later introduced. (Id.)

The federal and intervenor Defendants justify the "innovative" April and July agreements with the state of Colorado as an imperative compromise to exceedingly critical and complex competing needs for Gunnison River resources, especially the needs of the Aspinall unit. They explain that the 2001 quantification application presented a hydrograph of the canyon with three components: a base flow of 300 cfs throughout the year and peak and shoulder flows between early May and the end of July. The federal Defendants continue to explain that there was concern that the hydrograph's peak and shoulder flows could undermine the Bureau of Reclamation's ability to meet the intent of the 1956 Aspinall authorizing legislation. To satisfy the Bureau and other users of the river, a remark was added to the 2001 quantification application requiring the Secretary of the Interior to confer with the affected interests in implementing the Black Canyon's claim.

The federal Defendants acknowledge that the 2001 quantification application was filed three days before a change in administrations. After the new administration took office, "All the parties and the affected federal agencies recognized that the fundamental issue to be addressed was how to reconcile the Park's water needs with the Congressional mandates governing the Aspinall Unit." (Fed. Defs.' Opening Mem. 30.) The April agreement was the ultimate compromise to protect the Black Canyon and the present and future uses of Aspinall.

This Court finds that the effect of the April and July agreements was actually to remove the administration of the Black Canyon resources from the National Park Service in direct contravention of the National Park Service Organic Act, the Black Canyon Act and the Wilderness Act. Unlike forgoing a call on the river in dry years, as contemplated by the 2001 quantification application, the April and July agreements were a means to deprive the National Park Service of ever exercising a right to peak and shoulder flows of the Gunnison River. The agreements protected the Black Canyon's competitors, and once the Colorado water court approved the 2003 amended quantification application, those opposing the amended application would have no recourse as res judicata would prevent the reopening of the quantification decree. In re: The Application for Water Rights of United States, 101 P.3d at 1082.

The April and July agreements also run counter to the evidence before the National Park Service. The parties to this action agree that the Black Canyon needs peak and shoulder flows. There is no indication that the canyon would be denied these flows by the Colorado water court. To the contrary, the Colorado water court specifically found that the Black Canyon would receive the water necessary to conserve and maintain the canyon for all generations. Accordingly, the National Park Service cannot rationally base the agreements on speculation that the water court might deny the canyon needed water.

Finally, this Court further finds that the federal Defendants' justification that the Secretary of the Interior entered into the agreements in an effort to compromise the needs of the Aspinall unit

and the Black Canyon is no more than an after-the-fact rationalization by counsel.  The 2001

quantification application included a remark that provided protection for the Aspinall unit and others.

The April and July agreements were executed, however, to secure permanent priority for the Aspinall

unit and other water interests.  The agreements were not to ensure the protection of the canyon

because the Black Canyon was already protected.  The Court accordingly finds that it was arbitrary,

capricious and an abuse of discretion to enter into the agreements and relinquish a 1933 priority to

the full quantity of water necessary for the preservation of the Black Canyon.  Such a relinquishment

is nonsensical.  As articulated by the Colorado Supreme Court in Colorado Water Conservation Bd.

v. City of Central, 125 P.3d 424, 434 (Colo. 2005):

> A priority in a water right is property in itself.  Nichols v. McIntosh, 19 Colo. 22,
> 26-27, 34 P. 278, 280 (1893).  In fact, much of the value of a water right lies in its
> priority: "It often happens that the chief value of an appropriation consists in its
> priority over other appropriations from the same natural stream."  Id.  The value of
> adjudicating this property right "is that it allows a priority to the use of a certain
> amount of water at a place somewhere in the hierarchy of users who also have rights
> to water from a common source such as a lake or river."  Navajo Dev. Co., Inc. v.
> Sanderson, 655 P.2d 1374, 1377 (Colo.1982) (citing Nichols, 19 Colo. 22, 34 P. 278
> (1893)).  "Hence, to deprive a person of his priority is to deprive him of a most
> valuable property right."  Nichols, 19 Colo. at 27, 34 P. at 280.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the federal Defendants' entry into

the April and July agreements is **SET ASIDE**.  This matter is remanded to the National Park Service

for further proceedings consistent with this decision.  It is further

ORDERED that the federal Defendants' Motion to Dismiss is **DENIED**.  It is further

ORDERED that the Plaintiffs are awarded their costs.

Dated this _11th_ day of _September_ , 2006.

_Clarence A. Brimmer_

UNITED STATES DISTRICT JUDGE

SITTING BY DESIGNATION